This is the 1st District, 2nd Division. In the case, the appellate judges here today are Justice Aurelia Poczynski, Justice Terry Levin, and myself, Justice Smith. This is the case of Lange v. Deconstruction, 1-19-1999. Our procedure is as follows. The appellate will have the 1st opportunity for 10-15 minutes. Then we will ask our questions, so we will not interrupt you unless something unusual happens. Then the appellee will have their opportunity, and finally the appellant will close. With that in mind, you may start. Good morning, may it please the Court. Mike Leonard on behalf of the appellant, Mr. Romero. We're here today contesting a decision of the trial court which awarded Ms. Lange 50% of attorney's fees purportedly pursuant to a contingent fee agreement. The primary issue is that, number one, there was no contingent fee agreement, and certainly not one that included Ms. Lange, Mr. Romero, and the client, Mr. Larson. That is undisputed. Therefore, on that basis alone, there was no basis for the trial court to find that Ms. Lange was entitled to 50% of the fees pursuant to the non-existent contingent fee agreement. What is significant is that there was no testimony offered by either Mr. Romero, Ms. Lange, or Mr. Larson, the client, to establish that the three of them ever signed a contingent fee agreement, much less a consent to referral agreement. The only thing in the record and on appeal in the brief is Ms. Lange's musings that perhaps at some point in time, there did exist such an agreement, but I returned all my files to Mr. Romero, and therefore, I don't really know if there ever was such an agreement. Ms. Lange also relies upon a purported communication with Mr. Romero in which she alleges that Mr. Romero indicated that Mr. Larson had signed a consent to referral document. However, there's no testimony from anybody that such a document was actually ever signed, and significantly, with regard to that alleged communication, Ms. Lange has no specificity as to how that communication purportedly occurred. For instance, although she claims Mr. Romero at some point assured her that Mr. Larson had indeed signed a consent to referral document, there's nothing whatsoever to support that. For instance, she can't tell us or tell the court where that conversation took place, when, or by what means, and there's no documents ever memorializing such a communication between the two of them. Any inference that there was any such agreement between the third parties is entirely belied by a 2013 email that for purposes of appeal, Ms. Lange relies heavily upon. In that email, which includes the client, Mr. Larson, Mr. Larson clearly makes it known that he's uncertain as to what the status of his representation is, who's representing him, to what degree. That's completely contrary to an inference that Mr. Larson actually had signed a consent to referral agreement, and that he knew that Ms. Lange was representing her in those proceedings. It would make common sense and certainly would defy logic that Ms. Lange would not have responded if such an agreement existed to say to Mr. Larson something along the lines of, gee, don't you recall you signed that agreement consenting to the referral of the case for me, for me to represent you in this action. Of course, there was no such response by Ms. Lange because no such agreement was ever signed. Regardless of that, those factual, potential factual disputes, the parties clearly did not comply with rule 1.5 of the rules of professional conduct in two each agreed to assume joint financial responsibility for the representation of Mr. Larson. And two, perhaps more importantly, under rule 0.5, it's not satisfied because there is no document evidencing the fact that the client, Mr. Larson, ever agreed to any fee the lawyers would receive, and certainly no agreement was ever confirmed in writing. So clearly, the fee arrangement urged on the court by Ms. Lange is violative of rule 1.5. And I think that a case that's obviously instructive is the recent Bennett case versus KlaxoSmithKline from 2020, which has actually very remarkably similar circumstances. In fact, the evidence of an agreement in that case between the two lawyers was much stronger in Bennett. In Bennett, there were emails between the lawyers where they actually acknowledged the precise fee split. We don't have a email and response in this case in which Lange and Romero both evidenced an agreement to a fee split. We have in this case is something less, an email by Lange suggesting a fee split and no response at all from Mr. Romero. In the Bennett case, the attorney specifically agreed upon a fee-sharing arrangement. They were in different law firms. However, the crux of the problem in Bennett, just like in this case, is that in Bennett, there was no writing, there was no consent or agreement by the client or representation or to have a fee split between the attorneys involved in the Bennett case. And the court made it clear that it wasn't simply one of the lawyer's obligations to obtain the client's consent and signature on a written document. Both of the attorneys had responsibilities under rule 1.5 and absent one or both of them ensuring that the agreement complied with 1.5, it was per se, violative of Illinois law and void and unenforceable. The court in that case also rejected in Bennett some of the other legal theories that Ms. Lange has put forth before the court in this case, including the idea that they were perhaps joint venturers or that she's otherwise entitled to it under some sort of quantum merit theory. The court in Bennett made clear, it doesn't matter what the legal theory is that the attorney brings forth. If they don't comply with 1.5, 1.5 defeats all sorts of claims for the fee split, including rich fiduciary duty, the idea that there were joint venturers, and it would also seem to include rejection of any sort of quantum merit theory. I would also point out that in this case, just like the phantom consent to fee document, which has never been shown to exist, Ms. Lange also relies upon what she repeatedly refers to as a separation agreement with Mr. Romero. When you read the brief, you think that a separation agreement must be, as we commonly consider, a written document that says, hey, your employment ended. Here's how we're going to go for around certain cases. But if you read the common law record and read the briefs more carefully, you'll see that there is no such written separation agreement between Mr. Romero and Ms. Lange about the division of fees or responsibilities of any cases going forward, including the Larson case. And even if there had been a written separation agreement between Romero and Lange, that doesn't address the Rule 1.5 issue, meaning there was never consent or documentation to the client. In Rule 1.5, I'm going to interrupt you because you're misstating 1.5. You're talking about C, and C does not apply. It's E that applies. And if read the footnote in E, it indicates when an agreement is made between the parties, not the client, that's separate and distinct. And that does not appear to be what you're arguing here. You're arguing C, which has no relevance. Even under E, you don't need the client as long as professional standards are followed. Well, even if you were going to apply E, Your Honor, there is no such agreement. What we have to hear are two different factual realities which were never resolved by the trial court by making any credibility findings or having any hearing. What Ms. Lange alleges is that on some unidentified occasion, Mr. Romero purportedly agreed, we don't know by what means, we don't know where, we don't know when, that they would split the fees. There's no documentation, certainly nothing from Mr. Romero acknowledging the existence or agreement to any sort of fee split along those lines. So what you have, Your Honor, is testimony from Mr. Romero, which he testified by way of his affidavit that if you on your cases for you. Contrast that to Ms. Lange's testimony, that again, as she said, on some unidentified occasion, which is not documented or memorialized, that I will work on this case, the Larson case, and you will split the fee with me 50-50. So there's certainly a factual dispute. The judge never held a hearing on this issue or determined who was credible or the circumstances were of that alleged agreement. So even if you were to analyze it under whether there's an agreement between these attorneys, clearly a factual question existed that the trial court should have held a hearing, should have decided who was credible and made that determination, which it never did. Okay, now hang on. So what we have here is a situation where from 2010 to 2012, Ms. Lange worked at Romero's firm on this case while it was pending in Will County, and in 2012, it gets refiled in Cook by Lange, with Romero listed as co-counsel. She continues to work on the case until April of 2018, and you say she's entitled to no money. What is this, pro bono? No, Judge. No, I don't think it's pro bono, Judge, but I think they have to comply with the ethical rules, but we'll get in these kind of disputes in every case because one lawyer will say, here's my verbal or oral representation of what our agreement is. It would all be easily solved by the attorneys complying with the rule and common sense and documenting it in a contract. Judge, one of the issues that you look at in this case is that Ms. Lange, on first glance, I was pretty surprised that she had put together what appeared to be detailed billing records that were contemporaneous with her representation of Mr. Larson, but then she admitted in her affidavit she never kept track of her time, and that's at page 1188 of the record, her own affidavit at years later in response to a contest over who did what, she is admitting that she's completely recreating from scratch time records to try to justify a quantum Merowith calculation. Maybe she did that because she didn't trust your client, your client who said he was going to protect her lien. Well, Judge, she actually said she didn't keep track of her time, so for all the years, if she had any misgivings about Mr. Romero and his intentions throughout the entirety of the case, she never kept track of her time, so she only put together what appears to be those detailed time entries, Your Honor, according to her own affidavit after the case was contested and there was issue over the fees, but this could all be obviated. I understand that it seems like you could have an unfair result, but as the court in Bennett said, both attorneys have obligations. They're simple. She knew in 2013, Judge, five years before the case was over, that Mr. Larson himself was confused about the nature of the representation and who was responsible for the case, and in response to that, Ms. Lang chose to do nothing, and I know that it may seem to be a harsh result after the fact, but it would seem like it's not asking much of her in 2013 when the client says, gee, essentially, who's representing me, that she could have responded to him or had a retention agreement with Mr. Romero executed at that time, Judge, which are pretty simple steps. I don't think we're asking too much for them to do that, and as you know, plaintiff's side attorneys are very keenly interested in their retention agreements, their contingency fees, and we all do a lot to make sure that it's buttoned down, and unfortunately, in this case, she failed to do that, and she came before the trial court on a quantum claim, which the judge at the trial court never considered. He never considered that claim at all, so I think, at best, Judge, this case should be remanded for determination on that because, like I said, her affidavit makes clear that those time entries aren't real contemporaneous time entries. I'll reserve the mic. How do you square this situation that you're the Lopez case? They may have cut that, Judge. I don't know, but they certainly didn't cut a 50-50 deal in this case. Clearly, at best, there's a substantial credibility contest, Your Honor, between Mr. Romero and Ms. Lange. As I said, two sworn conflicting differences of reality, and I would say, Judge, Ms. Lange's statement about Romero agreeing to 50-50 is not very strong. She sends an email out, never gets a response, according to her, never gets Romero to agree to it, but yet she claims that on some unidentified occasion, who knows, in the time period what we're talking about, that Romero makes a representation that, okay, Larson has signed off on this agreement, but we know that doesn't make sense in light of Larson's 2013 email to Lange and to Romero. It seems like we had a credibility contest, which the judge never held a hearing on, to determine who was more or less credible and how that finding could be made. Well, what I find incredible is that we have a lawyer in front of us that's trying to tell us that we have to follow Rule 1.5, and 1.5e, subparagraph 2, indicates that the agreement is confirmed in writing. You have no shot here with that language, none. How would the agreement be confirmed in writing, Judge, between Lange and Romero? It's something called a computer. You write out a contract and you sign off on it. When you indicate that you're going to protect somebody's lien, you do so by saying, well, we have a contract here that you'll get 50-50 or 60-40. Look, this is the kind of work I did for 27 years. I understand that, Judge. Let's move on. Joanne, you may proceed. Thank you, Your Honor. May it please the Court, we're here today because Robert Romero attempted to surreptitiously circumvent Lisa Lange's properly perfected attorney's lien and keep all of the Larson attorney fees for himself without any court adjudication that he was entitled to do so. As part of his scheme, he lied to defense counsel and told them that all liens, including specifically Ms. Lange's lien, would be protected and satisfied in full. He never intended to satisfy her lien, obviously, and he almost got away with it. Fortunately, she was alerted to the filing of his motion to enforce settlement and was able to file her petition for adjudication and enforcement. It is undisputed, as the Court has already noted, that Lisa Lange was the only attorney of record in this case for nearly a six-year period. She was the only plaintiff's counsel known to defense counsel. They didn't even know who Robert Romero was until 2018. She filed all of the pleadings, made all of the court appearances, did all the liability depositions, and there were eight of them. And this was a complex case because there were nine defendants. She did all of this work pursuant to a separation agreement with Romero after he abruptly downsized in early 2012. And that separation agreement is, in fact, memorialized, and you can tell the timeline, contrary to what opposing counsel has suggested, from her emails on February 2nd and February 3rd of 2012. They talk about the 50-50 split. She actually says in the beginning, thanks for getting back to me. So clearly, they've had a telephone conversation, and she's memorializing what they said. And it clearly says 50-50 split for Larson and Lopez. And the email the next day clearly states that once he confirms that the new contracts have been signed by Larson in particular, she will file her appearance. She would never have filed her attempt without an assurance from Romero that Larson had signed the new contract. And indeed, he had a meeting with Larson on February 4th. That is also reflected in the email. So this notion that we don't know when or where the agreement was reached is simply belied by the actual evidence. As you noted, Judge Levin, the Lopez case clearly was the exact same deal. They were done in a Lopez. In the record, at 1276 to 1278, there is a new contract signed on February 9th, 2012, from Lopez, from the Lopez plaintiff. So these activities are taking place all within, let's spend a 10-day period, and he's getting new contracts from these clients. And he told her, as she states in her affidavit, that he got a signed contract acknowledging the 50-50 split from Larson himself. She would not have entered an appearance if she didn't have that. The only evidence from Larson himself, and I'm going to read it explicitly because opposing counsel has misinterpreted and taken some liberties with Larson's email. He says, do I need to drop Robert off the emails or are the two of you still sharing this case? This shows us two things. One, he knows they're sharing the case. And two, and this is a year and a half after the separation agreement was reached. He knows they're sharing the case, and he even wonders if Romero needs to be copied on emails because of his lack of involvement in the case. So this demonstrates that she's doing more than the lion's share of the work, and Romero is even, if anything, peripherally involved. So she relied on his representation that it was signed. And at some point in time, as she notes, she may have had a copy of this agreement in her possession, but either she misplaced it, or he never gave her a copy, or she returned it when she returned the file to him accidentally. But she was assured there was a signed contract in place. So the only evidence from Larson himself is the knowledge of the split. And Romero was in a unique position to obtain additional evidence from Larson. Once he discharged Lange from the case, she was prohibited from contacting Larson directly pursuant to professional conduct rule 4.2. But he had three months from the time she filed her amended petition until he filed his response because he blew a deadline and had to beg the court for an opportunity to respond late. He had three full months to get additional evidence from Larson. Where's the evidence from Larson himself that says that he didn't think there was a split? The email from him evidences the fact that he knew there was a split and that Lisa was doing all of the work. The only evidence that Romero gives us is his cursory and inherently contradictory affidavit. The first paragraph, which is incredibly troubling in that he states, Ms. Lange never performed substantial work on behalf of Mr. Larson. That is just a bald-faced lie. And it's astounding and very troubling that he continues to perpetuate this lie at every level, at the trial court level, at this level. We all know it's a lie because we can see in the record all of the work she did for six years. And he was aware that she was doing this. The second paragraph of his affidavit, in the alternative, he states that there was some kind of in-kind agreement for them. There's absolutely no evidence that there was. And if there was such agreement, where's his documentation or evidence or detail of any kind of what exactly he worked on for her, when that was, what work he would have performed, what cases they were? There's nothing there. It's just a conclusory statement with nothing to back it up. So the only evidence from Larson himself demonstrates the client consented to the sharing of the case. More importantly, because the split was pursuant to a separation agreement, Rule 1.5E is inapplicable because as it clearly states in Comment 8, Paragraph E does not prohibit the division of fees when lawyers were previously associated in a law firm or payments are made pursuant to a separation agreement. And we have both of those things here. They were associated in a law firm previously, and they also had a separation agreement. Romero offered no evidence to contradict Lange's evidence of the separation agreement or the assurance from Romero that he had a signed contingent fee agreement with her in it. So the trial court did not abuse its discretion in awarding Lange the fees. Judge O'Hara correctly concluded that Romero's evidence was insufficient. Moreover, this court reviews the judgment, not the reasoning of the trial court, and Judge O'Hara didn't give us very much insight into what exactly his reasoning was. Certainly, he could have been making a reasonable compromise since Ms. Lange's QM was considerably more than half the contingent fee. And the contingency amounts to about two-thirds of her QM claim. Let me ask you, was there ever any effort by your opponent to submit QM on the basis of what work he allegedly did and how hard he worked on the case for so many years? Absolutely not, Judge Levin. Absolutely not. In fact, as I said again, he had three months to come up with evidence, and all he did was dismiss the QM claim in a footnote at both the trial court level and the appellate court level. And we take the position that he's waived any opportunity to present any real evidence, including the kind that you've just mentioned. All he did, as we noted in our brief, after she took all the liability depositions, was attend a few doctor's depositions, from what we can tell, and then go to a mediation. And then he wants all the money for that. But even if the court... It sounds like the trial judge did Mr. Romero a favor here. He did. That's absolutely true. Yes, I think that was a reasonable compromise. Again, Judge O'Hara didn't give us much in the way of an explanation of how he came to that conclusion, but it's certainly a reasonable one, given the size of her QM claim. And this court can affirm the judgment on any basis, and that's certainly a reasonable amount, given her very well-documented and well-substantiated quantum merit. Thank you. Okay, you may close. Rebuttal. Thank you, Your Honors. Let me add a few points. With regard to the Lopez issue, I think the Lopez contract points out how easy and straightforward it would have been for the parties to memorialize an agreement with respect to Mr. Larson's case. With respect to Mr. Larson and counsel's statement that no discovery was conducted, I would note that in Ms. Lange's, I think, first filing, she said in a footnote that she was going to seek discovery on what Mr. Larson knew and did. And I think that points out the fact that we shouldn't, before the appellate court, be guessing about what Mr. Larson knew or what he approved of or consented to, when easily these findings of fact, also with respect to Ramiro's communications with Lange, could have been explored on cross-examination as to which ones are credible. Instead, we're left guessing about the intent of Ramiro, Lange, and Larson on appeal. And that could have been rectified by the evidence you're hearing. With respect to the separation agreement, it's hard to imagine that the rule contemplates separation agreement means one email, which is somewhat ambiguous to another party who doesn't respond to it, and that constitutes a separation agreement. I think as commonly used, we all understand a separation agreement is a separation agreement. It says, your employment's going to be terminated on the next date. Here's your responsibilities going forward. Here's our responsibilities going forward. Here's how we're going to pay you, etc. Those are commonly done every day in all sorts of employment contexts, not just with attorneys. So it's hard to imagine that drafters meant a separation agreement would constitute an email that's not responded to by one party from another. And I thank you for your time. All right. Thank you. We'll let you know as soon as we decide how we agree.